# CREIZMAN LLC

565 Fifth Avenue
7th Floor
New York, New York 10017
tel: (212) 972-0200
fax: (646) 200-5022
ecreiz@creizmanllc.com
www.creizmanllc.com

*Via ECF Filing and*
*Courtesy Copies via Hand Delivery*

January 23, 2013

The Honorable Kiyo A. Matsumoto
United States District Judge
United States District Court for the
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

**Re:  United States v. Gaetano Fatato, 04-CR-197 (KAM)**

Dear Judge Matsumoto:

I respectfully submit this letter on behalf of Guy Fatato in connection with his sentencing before your Honor scheduled for February 1, 2013 in the above-referenced action.

Over nine years ago, on April 14, 2004, Mr. Fatato pled guilty to conspiracy to distribute methamphetamine, in violation of 21 U.S.C. §§ 846.  The statute provides for a mandatory minimum sentence of 10 years, subject, however, to 18 U.S.C. § 3553(e), which enables the Court to impose a sentence below the mandatory minimum sentence, where, as here, the government moves for a downward departure based on a defendant's substantial assistance in the investigation or prosecution of others.  Based on Mr. Fatato's criminal history and the weight of the drugs involved in his offense, his Guidelines range is 100 to 125 months' imprisonment.  The defense does not contest this calculation, but submits that a substantial downward departure under the Sentencing Guidelines is warranted for the reasons set forth below.  Moreover, for the same reasons, a non-Guidelines sentence is "sufficient, but not greater than necessary" to satisfy the statutory objectives of sentencing set forth in 18 U.S.C. § 3553(a).

Much has been written about the truly extraordinary nature of Mr. Fatato's cooperation with the government, and deservedly so.  Over the course of a two-year investigation, during which he made hundreds of hours of consensual recordings, Mr. Fatato earned the trust of a high-ranking member of the Colombo crime family, worked his way up in that organization, and obtained invaluable information about the structure of the Colombo family and the criminal activities of that family, including historical crimes, recent crimes, and ongoing crimes.  Mr. Fatato lived the

Hon. Kiyo A. Matsumoto
January 23, 2013
Page | 2

life of an organized crime figure for almost two years, all the while putting himself at risk and leaving his family in the dark about his activities. Unlike many cooperating witnesses in organized crime cases, Mr. Fatato was not an active member of organized crime before he began assisting the government. Instead, he voluntarily participated in a risky and wildly successful FBI investigation using his friendship with a high-ranking organized crime member to gain entry into the inner workings of the Colombo family and obtain information that led directly to the conviction of many high-ranking figures, and indirectly to the conviction of many others as a result of targets of the investigation providing cooperation to the government. Since his participation as an organized crime informant ended, he has testified in several trials and spent hundreds of hours reviewing evidence with the government and assisting prosecutors in investigations and trials. He not only has managed to hold his family together and raise two young children through the stress of long periods in FBI Custody and in the Witness Protection Program, living under new identities, almost completely separated from their families and former friends, but he has succeeded in business beyond any reasonable expectations and currently employs around 50 people. Through his business ventures, he is self-sustaining and helps feed many families who are able to find employment in these tough economic times. While he must always look over his shoulder for fear of retribution by organized crime, and while he and his immediate family have almost completely separated themselves from their family, friends, and former community, Mr. Fatato has made the most of his new life.

The purpose of this letter is to highlight key aspects of Mr. Fatato's background, examples of his good character and rehabilitation, and his substantial cooperation, in order to help the Court fashion an appropriate sentence. *See* 18 U.S.C. 21 3553(a)(1) ("The court, in determining the particular sentence to be imposed, shall consider . . . the nature and circumstances of the offense and the history and characteristics of the defendant."); *Koon v. United States*, 518 U.S. 81, 113 (1996) (sentencing court should "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.").

## FACTUAL BACKGROUND

Mr. Fatato is 41 years old, but his experiences can fill lifetimes. As a young child, Guy's father and mother divorced and his mother remarried. Guy had to witness many acts of severe violence his stepfather inflicted on his mother, resulting in her many hospitalizations. The physical abuse included stabbings and beatings. His stepfather also was an alcoholic and a drug-abuser. Guy's home life was chaotic and he was unsupervised. Although Guy excelled at sports and attended college on scholarship, he frequently found trouble. At the age of only 25, he was convicted on charges of participating in a scheme with his biological father in connection with forging United States Treasury Bonds. He also participated in schemes to distribute drugs and in other criminal activity with childhood friends who had organized crime connections, resulting in a four-and-a-half year period of incarceration. After his release, Guy returned to participating in criminal activity, although he also worked in lawful occupations.

The crime that led to the conviction in this case was the result of a harebrained plan to raise capital to fund a start-up (lawful) nightclub business. A friend of Guy's, who had begun serving a sentence in federal prison, agreed to provide funding for Guy's business idea and serve as his business partner in exchange for his obtaining a Rule 35 motion through Guy's third-party

Hon. Kiyo A. Matsumoto
January 23, 2013
Page | 3

cooperation.  Without seeking the supervision and permission of law enforcement, Guy entered into transactions with a drug dealer he knew in an effort to make a case for law enforcement against the drug dealer.  Before he could find anyone in law enforcement interested in his cooperation, Guy was arrested.  It was at this point, in November 2003, at the age of 34, that Guy began to turn his life around.

For two years, Guy cooperated proactively with the DEA, providing information and making numerous consensual recordings, which assisted the DEA in the investigation and prosecution of others.  At the same time, Guy began operating nightclubs and those nightclubs became successful, including an upscale restaurant and lounge in Huntington, Long Island called the Rare Olive Lounge.  In connection with running these lawful businesses, Guy came into contact with Sonny Franzese, then in his late 80s, who was a high-ranking member of the Colombo crime family.  Guy had served time with Mr. Franzese and they became friends in prison.  Mr. Franzese immediately befriended Guy when they reunited and he began to bring him into the world of organized crime.  At the time, Guy was recording several of his conversations with Mr. Franzese, and reporting about his interactions with Mr. Franzese to the DEA.  Guy's infiltration into the Colombo family attracted the attention of the FBI, which recruited him to participate as an undercover operative in what turned into a two-year sting operation that yielded tremendous results for law enforcement.

Guy did not have to participate in the FBI's investigation.  It was a lot to ask of a young man who had two successful businesses.  And although Guy was facing a potential prison sentence for his drug distribution conviction, he had already provided enough assistance to the DEA to likely earn him a motion for a downward departure from the government.  Guy nevertheless chose to assist the FBI, at great risk to his own personal safety, to the ultimate detriment of his businesses and personal savings, and with substantial damage caused to his marriage and family life.  His undercover work became a full-time job – indeed, requiring Guy to leave his home and his family at all hours of the day and night, and at a moment's notice.  All the while he had his nightclubs to oversee and his family to attend to.  In addition, during this very hectic and stressful period, Guy managed to donate a kidney to his brother.

When his undercover work ended, it ended precipitously, after Guy had just made a substantial investment in the Rare Olive.  When he went immediately into FBI protective custody, Guy's savings evaporated and his income substantially declined overnight.  His wife and kids were uprooted from their lives, lifestyle, and their family and friends.  Guy lost his businesses and he had no ability to find gainful employment.  The 5K1.1 submissions by the government detail Guy's valuable and extensive cooperation.  From a broader perspective, it is clear that his work for the government provided law enforcement with a wealth of intelligence about organized crime activities in New York and nationwide, numerous convictions and a ripple effect resulting in many new cooperating witnesses for the government, and a tremendous resource concerning the inner workings of organized crime for many years to come.  Guy has continued to cooperate with the government, both as a testifying witness and behind the scenes.  His body of work will continue to further the interests of the public and law enforcement due to the information that can be used as evidence in further prosecutions and as background information for investigations.  In future investigations, the consensual recordings Guy made and the knowledge he has amassed may furnish links in the chain of evidence to obtain convictions.

Hon. Kiyo A. Matsumoto
January 23, 2013
Page | 4

After spending about one-and-a-half years in protective custody and then in the Witness Protection Program, Guy and his family left the Program on good terms and began a new life with their new identities. Guy has built businesses that have been very successful. He supports his family and sends his children to good schools. Although Guy spends much of his time working to keep the business going, he encourages his children in their educational pursuits and spends valuable time with them where he would never have been able to in his former life. His marriage has survived a rocky and stressful period and is now flourishing. Guy has created a wonderful home and future opportunities for his children. He has also put many others to work through his businesses, employing about 50 people. Guy will continue to work with the government as needed, but he has otherwise separated himself from his past. While Guy is concerned about his and his family's safety and their identities being disclosed, he views his cooperation as life-saving, enabling him to extricate himself from crime and negative influences and provide his family with a prosperous and fulfilling life.

## ARGUMENT

A non-custodial sentence is sufficient, but not greater than necessary to satisfy the statutory goals of sentencing as set forth in 18 U.S.C. § 3553(a). Under Section 3553(a), a district court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant." *Id.* § 35533(a)(1). Moreover, the Court must impose a sentence that is "sufficient, but not greater than necessary" to in, pertinent part: (i) "reflect the seriousness of the offense, promote respect for the law, and to provide just punishment for the offense" (*Id.* § 3553(a)(2)(A)); (ii) "afford adequate deterrence to criminal conduct" (*Id.* § 3553(a)(2)(B)); (iii) "protect the public from further crimes of the defendant" (*Id.* § 3553(a)(2)(C)); and (iv) and (iv) promote rehabilitation (*Id.* § 3553(a)(2)(D)). Here these factors strongly support the imposition of a non-custodial sentence.

To begin with, a non-custodial sentence would adequately "reflect the seriousness of the offense . . . promote respect for the law, and . . . provide just punishment." 18 U.S.C. § 3553(a)(2)(A). There is no dispute that Mr. Fatato's offense was very serious, but he has done everything in his power to accept responsibility for his actions and make things right. The extent of Mr. Fatato's cooperation is rare. His decision to participate in a full-time undercover operation for the government has provided an enormous public service and continues to do so. His success in business has contributed to the well-being of his family, his community, and society at large. I respectfully submit that he has given back to society more than he has taken from it, a rare accomplishment even for the most successful of cooperating witnesses. He cooperated at great risk to his personal safety, with substantial sacrifice of his personal life to the detriment of his family, and with very damaging financial consequences (at the time). He continues to serve as a substantial resource to law enforcement. Under the circumstances, a prison sentence for Mr. Fatato would "promote not respect, but derision, of the law." *Gall v. United States*, 552 U.S. 38, 54 (2007).

A non-custodial sentence also would "afford adequate deterrence to criminal conduct," both general and specific. 18 U.S.C. § 3553(a)(2)(B). As an initial matter, almost *ten* years have passed since Mr. Fatato's offense, and "[t]he deterrent value of any punishment is, of course, related to the promptness with which it is inflicted." *Coleman v. Balkcom*, 451 U.S. 949, 952

(1981). Furthermore, Mr. Fatato's life, and that of his family, was completely upended by his criminal conduct. If not for the strength of his character, his determination to succeed, and his devotion to his family, Mr. Fatato's marriage would have imploded and his economic circumstances would have been meager. He has almost no contact with even his closest family members. He must be concerned every day – every moment – with his and his family's safety. He must concentrate every day – every moment – on keeping the secrecy of his and his wife and young children's new identity intact. In these circumstances, one "need only consider what happened to [Mr. Fatato] in order to reconsider [committing similar crimes]; thus, general deterrence [is] served." *United States v. Redemann*, 295 F. Supp. 2d 887, 897 (E.D. Wis. 2003). For all the same reasons, a non-custodial sentence is more than sufficient to "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C). Indeed, the very severe "personal, business, and family consequences [Mr. Fatato] has experienced will likely deter [him] from future misconduct." *Redemann*, 295 F. Supp. 2d at 897. *See also*, *United States v. Gangi*, 881 F. Supp. 820, 828 (E.D.N.Y. 1995) ("[I]t is appropriate to consider any adverse effects suffered by a defendant and his family as a result of substantial assistance to the government in ruling on an application for a reduction in sentence."); *United States v. Mizrahi*, 2008 WL 3009983, at *2 ("[S]pecific deterrence is obtained through the loss of a valuable business . . .").

A non-custodial sentence also is more than sufficient to achieve the objectives of rehabilitation. *See* 18 U.S.C. § 3553(a)(2)(d); *United States v. Blake*, 89 F. Supp. 2d 328, 345 (E.D.N.Y. 2000) ("Rehabilitation remains a fundamental consideration at sentencing."). In circumstances where a defendant has made substantial post-arrest rehabilitation -- and here, that would be a huge understatement with respect to Mr. Fatato -- a sentence of imprisonment "would reverse the progress [Mr. Fatato] has made." *Id.* at 346. Mr. Fatato should be able to continue operating his businesses, contributing to society, and raising his children. *See, e.g.*, *United States v. Neiman*, 828 F. Supp. 254, 255 (S.D.N.Y. 1993) ("[w]here a regime combining effective punishment for purposes of deterrence and supervision for purposes of prevention can further be combined with rehabilitation efforts involving that supervision, the objectives of the statute may be fulfilled; if incarceration would be ineffective for these purposes and counterproductive from the viewpoint of rehabilitation, a departure from the Guidelines is appropriate"). Here, even a brief period of incarceration would completely destroy all the progress Mr. Fatato has made and the life he has built for his family. A sentence of incarceration would expose him to the public, endanger his life, ruin his businesses, leave his family without a provider, and leave his employees without jobs or means to help support their families.[1] *See United States v. Milikowsky*, 65 F.3d 4, 8 (2d Cir. 1995) ("Among the permissible justifications for downward departure . . . is the need, given appropriate circumstances, to reduce the destructive effects that incarceration of a defendant may have on innocent third parties."). In any event, at the age of 41, ten years removed from his offense, with success in lawful business and with his marriage and family life thriving, Mr. Fatato simply has no incentive to ever engage in criminal activity again and has every incentive to remain a productive member of society. He is invested in his new life. There is virtually no chance of recidivism here.

---

[1] As a result of their new identities, and lack of documented history, Mr. Fatato's wife cannot obtain gainful employment in the field of education, for which she earned a college degree.

Hon. Kiyo A. Matsumoto
January 23, 2013
Page | 6


For all these reasons, and the information provided in the submissions by the government and by Probation, we respectfully request that the Court impose a non-Guideline, non-custodial sentence.

Respectfully submitted,

/S/ Eric M. Creizman
Eric M. Creizman (EC-7684)
Creizman PLLC
565 5th Avenue, Fl. 7
New York, New York 10017
Tel.: (212) 972-0200
Fax: (646) 200-5022
Email: ecreiz@creizmanllc.com


cc:     James Gatta, Esq. (by ECF and email)
        Assistant United States Attorney